Opinion of the court, by
Judge Hitchcock:
In September, 1826, the State of Ohio, by her agents, the canal commissioners, entered into contract with Hatheway and Scovil, for the excavation of section No. 1 of the deep cut of the Ohio canal, on the Licking summit, lor which the said Hatheway and Scovil were to receive fifteen cents per cubic yard. A similar contract and upon the same terms was entered into with Osborn, Williams & Co., for the construction of section No. 2.
On Octo’ber 31, 1826, the complainants contracted with the said Hatheway and Scovil, and the said Osborn, Williams & Co., to perform the greater part of said work, at and for the" price of thirteen cents per cubic yard.
In pursuance of .this contract, the complainants commenced operations, expended considerable sums of money in fixtures, etc.^ and carried on the work until September, 1828, when they abandoned it altogether.
The contracts proved unfavorable both to the original and subcontractors, and was not completed upon the terms originally agreed upon. These were abandoned and new contracts made, and for some of the last of the work the state paid for excavation as high as fifty cents per cubic yard.
Hampson and Parkinson, claiming that'they had sustained loss *319 by their subcontracts, applied to the general assembly for relief. And on March 7, 1835, that body passed an act as follows:
'• Seo. 1. Be it enacted by the general assembly of the State of •Ohio, that the claim of James Hampson and John S. Parkinson against the State of Ohio, be, and the same is hereby *referred to the board of canal commissioners, who shall proceed to make or cause to be made, as soon as practicable, a full and impartial examination and estimate of the labor done in the construction of sections one and two of the Licking summit, by said Hampson and Parkinson; which estimate shall be made on fair •and equitable principles, between the parties.”
“Sec. 2. The canal commissioners^are hereby authorized and directed to pay to the said Hampson and Parkinson out of the canal funds, as in other cases, the amount of such estimate and damages, found due said Hampson and Parkinson.” 33 Ohio L. L. 309.
The decision of the board of canal commissoners under this law not being satisfactory to the complainants, they again memorialized the general assembly, which body, on March 14, 1836, passed the following joint resolution: “Resolved, by the general -assembly of the State of Ohio, That the board of public works be, and they are hereby required, to reinvestigate the claim of James Hampson and John S. Parkinson, for compensation for work and labor done by them upon the Ohio canal. The investigation shall be made upon the principles prescribed in the act entitled an act for the relief of James Hampson and John S. Parkinson, passed February 7, 1835; said board shall have power to send for persons and papers, and it shall be their duty to carefully re-examine all the books, papers, reports, and testimonials relative to said claim. They shall ascertain the amount of labor done by the claimants .and make a fair estimate of the value thereof; they shall deduct from said estimate the amount already paid the claimants, and strike the balance, if any, due in equity and justice to said Hampson and Parkinson. They shall add to said balance the interest rightfully due thereon, and certify the aggregate to the canal fund commissioners. Upon receiving such certificate, the canal fund commissioners are hereby authorized and required immediately to cause the amount so certified to be paid to said Hampson and Parkinson out of the canal fund. It shall be the duty of said board of public works to perform the duties enjoined upon them *320 by this resolution prior to the next session of the general assembly.”
In pursuance of this resolution, the board of public works investigated the claim of the complainants, and made a report on the subject. With this report, however, the complainants were no better satisfied than with the decision of the canal commissioners. Another application for relief'was made to the genei’al ^assembly, and on March 5, 1838, an act was passed, entitled “ an act to carry into effect the acts heretofore passed for-the relief of James Hampson and John S. Parkinson.” This act is in the following words:
“Sec. 1. Be it enacted, by the general assembly of the State of Ohio, That James Hampson and John S. Parkinson,-of the-county of Muskingum be, and they are hereby authorized to prefer, institute, or file in the Supreme Court of this state, at or to any term thereof, in the county of Franklin or in - bank, an amicable suit in chancery against the State of Ohio, for such claim as they may have against the state, on account of labor done or the services performed on sections numbered one and two, on the deep cut of the Licking summit of the Ohio canal; which suit or action shall be set down for hearing at the first term of said court after its institution, unless for good cause shown it shall-be continued; and shall be heard, considered, and decided as other causes are, by law or the rules of said court, heard and decided; and notice of the pendency of suit or action shall be given-by a copy of the proper process being left with or served upon the governor of this state, at least sixty days before the sitting of said court in which said suit or action shall have been insti-' tuted; and the governor is hereby authorized to employ counsel to appear and attend to said suit or action on behalf of and for the State of Ohio.
“ Seo. 2. That in determining said cause no objection shall betaken to the right of said Hampson and Parkinson to prosecute the same for the reason they were subcontractors; and in adjudicating the same, the court shallbe governed by the principles contained in the act of March 7, 1835, entitled ‘an act for the relief of Hampson and Parkinson,’ and the joint resolution on the same subject, passed March 14, 1836, having reference to the several contracts heretofore made with contractors and subcontractors and the payments made and allowed under them, so- *321 far as they may deem such reference necessary to subserve the ends of justice, according to the principle of said act and resolution.
“Sec. 3. On the final hearing of said suit, if a decree should be rendered in favor of the claimants, the amount of said decree of said court shall be certified by the clerk of said court, under the seal thereof, and upon presentation thereof to the auditor of state, it shall be his duty to give to said claimants, plaintiffs as aforesaid, an order upon the treasurer of state for the amount of such *final judgment and decree so entered and rendered by the said court, with costs to be paid out of the canal fund of this state. But should the court be of opinion that the said Hamjison and Parkinson have no valid claim, as set out by them in said suit or action, in law or equity, on account of performance of work done by them on said sections numbered one and two, in said deep cut, or the act and resolutions of the general assembly in relation thereto, the said court shall dismiss such suit or action at the costs of the said Hampson and Parkinson.”
Under the provisions of this last-recited act the bill is presented, and an answer has been filed by the attorney for the state. The object of the complainants is to obtain compensation for work which they have done upon the canal, and for which they have not, as they claim, been fully paid. The case is one out of the ordinary jurisdiction of the court, and we are called upon to act rather as commissioners to liquidate a claim against the state, upon principles settled by the law conferring the power, than as a judicial tribunal deciding a case upon the ordinary principles of law and equity. If the case was presented to us for decision upon the known and established rules of law and equity, it is manifest that the complainants’ bill must at once be dismissed.
There was no privity of contract between the State of-Ohio and these complainants. The work by them performed was not, strictly speaking, performed for the State of Ohio. It was performed for the benefit of Hatheway and Scovil, and of Osborn, Williams & Co. And to these latter individuals the state was holdcn to make payment. And, according to the testimony in the case, to these individuals payment was actually made, and beyond the price stipulated in their contracts. If these contractors failed to pay over to the complainants, their subcontractors, it was not the fault of the state. The courts were open, and they might, at any time, have enforced their legal claims against those *322 who employed them. At least such would be the law where ’individuals were contracting parties. Should A. employ B. to build lor him a house for a stipulated price, and should B. employ C. to do a part of the work at another stipulated price, will it be pretended that C., upon the failure of B. to make payment, could have his action against A. for the work and labor? And more especially after A. had made compensation to B., in full, according to his agreement. I am not aware that it makes any difference that the state is one of the contracting parties.
But we are not to consider this case upon the known principles *of law and equity alone, but upon those principles taken in connection with and measurably controlled by the special legislation before referred to. There is some difficulty in fully comprehending what was intended by this legislation. It seems to me, however, that the object was to make to the complainants a compensation for the balance due on the work performed by them, after deducting all payments made on that work. And in ascertaining this balance it was designed to have this work estimated, not at the contract price, but at its intrinsic value. In other words, they intended to place the complainant in the same situation with a plaintiff prosecuting a suit upon a quantum meruit. In the resolution of March 14, 1836, the board of public works are directed to “ ascertain the amount of labor done by the claimants, and make a fair estimate of the value thereof," and then deduct the amount paid, etc.
If this be the proper construction of this legislation, and we think it is, then the court have first to ascertain the amount of labor performed by the complainants on the two sections of the canal referred to.
On this point, however, there is no difficulty. It is agreed that the work performed, consisted'of excavation, and that the excavation on section numbered one amounted to 212,910 cubic yards; on No. 2, 171,000. In the whole, 389,910 cubic yards.
The next inquiry is as to the fair value of the work. Upon this point a number of depositions have been taken, and the witnesses differ very much in their estimates. The complainants, in one of their memorials to the legislature, and which they have introduced as evidence in this case, say that “they performed their work with a skill unsurpassed in the line of canal, and as energetically and economically as any other contractors, and actually expended, for *323 the benefit of state, on said work, $41,439.33. It is reasonable to suppose that the complainants themselves would be better acquainted with the costs of the work than those less intimately connected with it, and probably.this allegation is not far from the truth.
David Ruffner, one of the witnesses for complainants, says the ■excavation performed by the complainants was worth sixteen cents per yard. Estimating it at this price, we should find the whole work to be worth $61,425.60, or $19,931.67 more than it actually cost.
*David Shaw, another witness for complainants, says that it was worth eighteen and three-fourth cents per yard. By this ■estimate the value of the work would amount to $71,983.12J, or $30,489.19J more than its actual cost,
Anthony Butler, another of complainants’ witnesses, says that it was worth twenty cents per cubic yard. This would make the whole work worth $76,782, or nearly one hundred per cent, more than its actual cost.
These estimates would give to canal contractors immense profits on their work — more, we believe, than what has been usual. And ■a comparison of the estimates of the value of the work, with the actual cost of that work, convinces us that these estimates are too high. It is right and proper that a reasonable profit should be made, but a profit of from fifty to one hundred per cent, is rather extravagant.
¥e next have the testimony of Micajah T. Williams, Alfred Kelley, and John Creed. These are witnesses of candor, and the two former, at least, are well acquainted with the value of this kind of work. They differ in their estimate from ten to thirteen cents per cubic yard, making the average about eleven and a half cents. It would, perhaps, be safe to take the estimate of these witnesses in establishing the rule of compensation. But inasmuch as Messrs. Kelly and Williams were the agents of the state in putting this work under contract, and in superintending its construction, it will, perhaps, be more satisfactory to all concerned to place their testimony out of the case.
On the whole, we incline to take the opinion of Joseph Ridgway, jr., as that by which we are governed in putting a value on this work. We do this because all concerned appear to put full confidence in his integrity and ability. Besides, he was well acquainted with the work as it progressed; and as an engineer, has *324 been accustomed to estimate the value of this description of work Mr. Kidgway says that taking into view the expense incurred by' the complainants in their fixtures and arrangements, made with reference to the completion of the job, the excavation done by them on section No. 1, was worth thirteen cents per yard, and that on section No. 2, eleven cents.
The value of the work, according to the testimony of this witness, is as follows:
212,910 yards on section No. 1, at 13 cts, per yard, $27,678 30
171,000 yards on section No. 2, at 11 cts. per yard, 18,810 00'
Amounting in the whole to...........................$46,488 30
*Being an advance of $4,994.37 upon its actual cost.
This amount is to be reduced by all payments made by the state toward this particular work. Complainants admit that they have received $25,183.68, but deny that they have received anything beyond this, and claim the balance, after having deducted the amount thus received. On the other hand, it is claimed, on the part of the state, that more than $40,000 was paid to the original contractors for this work, and it is denied that the state could, in any manner, be held answerable for the faithful payment by these contractors to their subcontractors. It is, therefore, insisted that a credit should be allowed to the state equal in amount to what she has paid. This is an important question, so far as respects these complainants and the people of the state. But that we may properly settle it, let us, for a moment, lay the parties to this case out of view, and examine the principles applicable to the hypothetical case before stated. That case is, A. contracts with B. to build for him a bouse of specified dimensions, and for a specified price. B. contracts with O. to do the whole or a part of the work, likewise at a specified price, and at a price less than that which he himself is to receive from A. as the work progresses. A., from time to time, makes payments to B. according to his contract, and when the work is completed, pays him off in full. Afterward it is lound, however, that B. has not fully paid C., who has done the work, or a part of it, and C. files his bill, or commences his action against A., claiming payment from him for his labor, on the ground that “ the laborer is worthy of his hire,” and that A. has been benefited by his (C.’s) labor. True, when he performed this labor, he did it, not for, or on, the credit of A. With him he had no con *325 tract; with him he kept no account; his contract is with B., and •so far as he has received payment, it has been from the hands of B. But still, inasmuch as the house, when completed, is the house of A., and is of some benefit to him, he insists that, although A. has once paid for this house, he shall pay for it again. What court would, for a moment, entertain such a claim ? What lawyer would •commence such a suit?
Still the case before the court is precisely the same in principle as this hypothetical case. The agents of the state had no contract with Hampson and Parkinson; they made no payments to them, they kept no accounts with them. And in what situation, I ask, would the state be placed in the attempt to prove the ^amount of payments made by Hatheway and Scovil, and by Osborn, Williams & Co. to Hampson and Parkinson? If called upon to do this, she would be called upon to do that, about which neither she nor her agents had or could, in the ordinary course of things, have any knowledge. I know that it is sometimes said, that it is beneath the dignity of a great state to resist claims brought against her upon principles like these, that is, the principles of law and equity! Such language may be addressed to a legislative body, to induce the allowance of a claim that is unfounded in law or equity, but ought not to be addressed to a judicial tribunal. In truth, there is not the least foundation in the ordinary principles of either law •or equity, for the pretense of the complainants’ counsel, that the state should not be credited to the extent of the payments made to the original contractors for this work. The injustice of such claim seems to have been manifest to the complainants themselves; for Hampson, in his memorial to the legislature, which induced the passage of the law authorizing the institution of this suit, says : “Tour memorialist does not ask that the state shall pay a second time for any work which has been paid for, to them, or the •original contractors. But he does ask the privilege of showing: 1. The amount of labor performed. 2. That this labor has not been paid for at its fair value, to them, or anybody else,” etc.
This memorial is one of the documents submitted to the court by the complainants in this case; for what reason we know not, unless it be intended as a guide to direct us in the construction -of the law.
But suppose the claim submitted by the counsel for complainants should be admitted to be correct, and the state should re *326 ceive no credit beyond the amount which the complainants admit, they'have received from the original contractors, what would be the consequence ? The state, then, would be compelled to pay a. second time for this work ?
It is probable that Hampson and Parkinson had laborers under them who performed this work, and to whom they were to pay stipulated prices, and it is possible that these laborers may not-have been entirely paid. If such be the fact, and the principle insisted upon by the complainants’ counsel be correct, these laborers have a claim, equally founded in justice, with that of Hampson and Parkinson, against the state for a compensation for the labor by them actually performed. And carrying the principle out, the state having once paid for the work to the contractors, *and having paid for it again to the subcontractors, must in the end pay over again, and the third time-to the manual-operatives who actually performed the work. Such would be the practical operation of the system advocated by those who hold that it is “ beneath the dignity of a great state ” to require of those with whom it deals, that they should be bound by their contracts.
The ground assumed by the complainants’ counsel in advocating the position that the complainants are entitled to compensation,, exclusive of payments made to the original contractors, is not,, however, based upon the supposition that such position is founded upon the abstract principles of law and - equity, but that it is sustained by the special legislation having reference to this particular case. Before examining the subject in this point of view, it may not be improper to remark that it is hardly to be supposed that the legislature would pass an act so impolitic as well as unjust, as would be one which would compel the .people whom they repreresent, to pay a second time for labor performed in constructing the internal improvements of the country, after they had once in good faith paid for the same work, and paid, too, .to the persons entitled to receive payment. It must be remembered, too, that the-complainants, in asking for this special legislation, admitted the propriety of the state’s having a credit for the full amount which had been paid to the original contractors, and it can not be supposed that it was the intention of the legislature to give them anything over and above what they required.
Having made these remarks, let us examine this special legis *327 lation. The act of March 7, 1835, merely authorizes and requires the canal commissioners to make “a full and impartial examination and estimate of the labor done in the'construction of sections one and two of the Licking summit,” by Hampson and Parkinson, “ on fair and equitable principles,” between the “ parties,” and to pay to them the amount of such estimate which should be found due. Whether in making this estimate, reference was to be had to the contracts under which the work was done, is not prescribed. But inasmuch as the law was silent upon this subject, I suppose that the commissioners, in acting under it, must be controlled by those contracts.
Next comes the joint resolution of March 14, 1836. This required the board of public works to reinvestigate the claim of the complainants, upon the principles prescribed in the act above ^referred to. They are directed to “ ascertain the amount of labor done by the claimants, and make a fair estimate of the value thereof.” By this, I understand that the board of public works were required to ascertain the intrinsic value of the work, without reference to contract price. After having ascertained this value, they are required to “ deduct from said estimate the amount already paid the claimants, and strike the balance.” This clause would seem to favor the construction contended for by the complainants’ counsel, and possibly, was there nothing further in this special legislation, we might so decide. To this balance, interest was to be added.
By the act of March 5, 1838, the duty previously required to be performed in the first instance by the canal commissioners, and in the second by the board of public works, is transferred to this court. And the court are required “in adjudicating the same” (that is the ease Instituted in pursuance of the act), to “be governed by the principles contained” in the before-recited act and resolution, “having reference to the several contracts heretofore made with the contractors and subcontractors, and the payments made and allowed under them, so far as they may deem such reference necessary to subserve the ends of justice, according to the principles of said act and resolution.” In neither the previous act or resolution is any reference had “ to the several contracts.” But by this act the court are required, “if necessary to subserve the ends of justice,” to have reference to these contracts, “and the payments made and allowed under them.” No payments have *328 ever been made by the state to these complainants, but payments have been made to the original contractors under these contracts. And “the ends of justice” can not be subserved without having reference to those payments. It seems to me, therefore, that it must have been the intention of the legislature that these payments should be deducted from the real value of the work. This was the proposition made to that body by Hampson, one of the complainants, and this last special act was passed to meet that proposition.
"We find, then, that the value of the work was $16,488.30. From this must be deducted the amount paid by the agents of the state on their contracts with Hatheway and Scovil, and with Osborn, Williams & Co., for the same work. For the balance, together with the interest from January 1, 1829, the complainants are entitled to a decree.